T.C. Memo. 2010-272

UNITED STATES TAX COURT

DEAN F. AND JOCELYNE S. PACE, Petitioners <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 13446-07.                    Filed December 13, 2010.

Dean F. Pace, pro se.

<u>Carolyn Schenck</u> and <u>Alan Cooper</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Dean Pace is a successful plaintiff's
attorney who in 2001 recovered over $1 million in legal
settlements.  But he didn't file his 2001 return until 2003.  The
IRS audited him, Pace submitted an amended return, and then the
Commissioner issued a notice of deficiency based on the original

2001 return.[1]  The case is almost entirely about whether Pace substantiated a very large number of personal and business expenses.  The parties argue about many of those deductions, the use of Pace's amended return, and the additions to tax and penalty that the Commissioner has determined.

## Background

The Sovereign Military Hospitaller Order of St. John of Jerusalem, of Rhodes, and of Malta was established in the mid-eleventh century, when merchants from Amalfi founded the Benedictine Abbey of St. Mary of the Latins in Jerusalem.  By 1080 the abbey built St. John's hospital--located on the traditional site of the angel's announcement of John the Baptist's conception--which provided a place of refuge for poor and sick pilgrims visiting the Holy Land.  Under the leadership of Brother Gerard, the Hospital of St. John grew to include several ancillary hospices in Palestine along the pilgrimage route.  Pope Paschal II officially recognized the hospital in 1113, establishing the Order of St. John.

As the twelfth century wore on, the Hospitallers of St. John expanded their medical mission to preventive care by providing armed escort to pilgrims traveling the hostile route to Jerusalem.  Crusading knights who stayed in Jerusalem began to

---

[1] Jocelyne Pace is a party only because she and her husband filed a joint return.  All references to Pace refer to Dean Pace.

join the Order, and by 1148--the time of the Second Crusade--the Hospitallers of St. John were recognized as an essential part of the Holy Land's defense.  Specialization crept in and the Order became divided into knights and nurses, but the Order stayed true to its original calling by rebuilding the original hospital. John of Würzburg, a German pilgrim, described the place in 1160:

> Over against the Church of the Holy Sepulchre * * * on the opposite side (of the way), towards the south, is a beautiful church built in honour of John the Baptist, annexed to which is a hospital, wherein in various rooms is collected together an enormous multitude of sick people, both men and women, who are tended and restored to health daily at a very great expense.  When I was there I learned that the whole number of these sick people amounted to two thousand, of whom sometimes in the course of one day and night more than fifty are carried out dead, while many other fresh ones keep continually arriving.

John of Würzburg, *Description of the Holy Land*, *in* 5 Palestine Pilgrims' Text Society:  Publications 44 (Aubrey Stewart trans., London 1896).

The next several centuries did not go as well.  The Order was forced out of Palestine by 1291, when Muslim forces took its last stronghold in Acre.  The knights took refuge in Cyprus, and then established a sovereign territory in Rhodes in 1309.  They were under constant pressure, and were besieged by the Ottoman Navy in 1480.  About 600 knights and 1,500 to 2,000 soldiers repelled it, but the Turks returned with a large army in July 1522.  By December the knights' position had become desperate; supplies were running low and there was little hope of

reinforcements.  L'Isle Adam--the Grand Master of the Knights of Rhodes--surrendered and withdrew with his brethren on January 1, 1523.

By 1530 the Order had settled in Malta.  Charles V of Spain gave the island to the knights in perpetual fiefdom in exchange for an annual tribute of one Maltese falcon.  The original goal was to retake Rhodes, but when this didn't work out the Order stayed in Malta for 268 years and became known as the Knights of Malta.  They continued their naval mission of patrolling the Mediterranean to check Ottoman power.  And perhaps the most famous moment in the Order's history happened in 1565 when an Ottoman force again laid siege against them.  Their successful resistance was of enormous moral importance to Europe and was celebrated throughout the West.  Even more than two hundred years later Voltaire would state:  "*Rien n'est plus connu que le siege de Malte*" (nothing is better known than the siege of Malta). European monarchs showed their support for the Order by sending funds to rebuild.  The knights built another great hospital, churches, and even a university on their island.

The Order, however, could not withstand Napoleon, who took Malta in 1798.  Disarmed, disisled, and dispersed, the knights entered what looked to be a long decline.  They needed a new mission and, in 1834, they took their current name of the Sovereign Military Hospitaller Order of Saint John of Jerusalem,

of Rhodes, and of Malta which is, however, in neither Jerusalem,
nor Rhodes, nor Malta, but in Rome.  They returned to hospital
service and greatly expanded their humanitarian work during the
first and second World Wars.  As the end of the second millennium
neared the Order had become a major global organization with a
medical-aid, emergency-relief, and humanitarian mission.  One
commentator described their modern rise:

> The age of software, economists and pocket calculators
> has been caught napping; that of chivalry has crept up
> behind it and taken it unawares.  A hundred years ago
> the Order of Malta appeared a mere honorific memory of
> the crusades * * * Today the Order exchanges
> ambassadors with nearly sixty governments; it has more
> than ten thousand knights in thirty-nine national
> associations throughout the world; its decorations have
> been proudly accepted by republican heads of state from
> Africa to the United States; and above all it conducts
> an international Hospitaller activity with few equals
> in size, modernity and efficiency.

Sire, The Knights of Malta, at xi (Yale University Press 1994).

### FINDINGS OF FACT

Pace is an heir to this ancient legacy.  He is also one man
in three parts.  As Dean Pace, Esq., he has practiced law for
over 50 years and become an unusually successful attorney
specializing in *qui tam* litigation[2]--as he himself testified:  "I
don't think anyone is equal to me in *qui tam* actions."

---

[2] *Qui tam* actions are brought under the False Claims Act, 31
U.S.C. secs. 3729-3733 (2006), which entitles individuals with
knowledge of fraud against the U.S. Government to sue on its
behalf.  Whistleblowers are rewarded with 15 to 30 percent of the
recovery; the lawyers take home generous contingency fees.

Whistleblowers are rewarded handsomely in *qui tam* litigation, and Pace takes home about half of the reward via contingency fees. But the flow of income is uneven--sowing seeds in years of famine for reaping in years of plenty. Pace feasted in 2001--he recovered over $2 million in legal settlements and took home over $1 million in contingency fees.

As Mr. Dean Pace, Pace is also a *bon vivant*. He frequents the Bel Air Country Club, drives a Jaguar, visits France regularly, and enjoys $10,000 bottles of wine and bespoke shirts. He has numerous friendships, here and in Europe, that he has sustained over the decades--people with whom he shares an interest in fine wine and dining, plus many professional contacts and former clients.

And, finally, there is Sir Dean Pace, a man of faith and a Knight in Obedience in the Sovereign Military Hospitaller Order of St. John of Jerusalem, of Rhodes, and of Malta. As a Knight in Obedience, Pace is required to participate in an annual pilgrimage to Lourdes[3] and contribute time, talent, and treasure to the Order. He contributes to the Order's U.S. affiliate, which the IRS recognizes as a charitable organization. Pace's confusion of business, personal, and charitable expenses is what prompted the IRS to issue a notice of deficiency. The Court

---

[3] Lourdes is a small town in southwestern France that hosts a major pilgrimage with 5 million annual visitors. Volunteers from the Order tend to the pilgrims who are poor and sick.

conducted an audit by trial in Los Angeles, where the Paces resided when they filed their petition.

OPINION

I.  Preliminaries

We begin by reviewing some of the basics of substantiation. The most important rule is that taxpayers have to keep records. Section 6001[4] and its accompanying regulations tell taxpayers to hold onto records that would enable the IRS to verify their income and expenses. See sec. 1.6001-1(a), Income Tax Regs. Unsophisticated taxpayers unfamiliar with the substantiation requirements often get extra leeway in their good-faith attempts to comply. See, e.g., Larson v. Commissioner, T.C. Memo. 2008-187. But sophisticated attorneys like Pace should know better.

As a general rule, we presume the Commissioner's determination in the notice of deficiency is correct. See also Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Because the taxpayer is usually in a better position to show what he earned and what he spent, it is he who generally has the burden of proof. At least for tax years after 1998, the burden can shift to the Commissioner, but only if a taxpayer produces credible evidence meeting the requirements of section 7491(a).

---

[4] Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for 2001, and all Rule references are to the Tax Court Rules of Practice and Procedure.

But with few exceptions, it does him no good to argue that the Commissioner wasn't working with good information--the notice of deficiency puts issues in play for trial; we generally do not look behind it.  Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984).

Pace objects to the Commissioner's decision to base the notice of deficiency upon his original, rather than his amended, return.  He is simply wrong--the Commissioner is not required to treat an amended return as superseding an original return. Fayeghi v. Commissioner, 211 F.3d 504, 507 (9th Cir. 2000), affg. T.C. Memo. 1998-297.  And it is within the Commissioner's discretion to determine the deficiency using the original return. Colvin v. Commissioner, T.C. Memo. 2004-67 (citing Koch v. Alexander, 561 F.2d 1115, 1117 (4th Cir. 1977)), affd. 122 Fed. Appx. 788 (5th Cir. 2005).

Pace also attempts to prove his deductions with his appointment book and with various schedules of expenses that he prepared specially for trial.  We treat these as argument--not evidence--and use them only to guide us to the appropriate canceled check or credit-card statement.  We rely on those checks and statements, as well as Pace's testimony (to the extent we find it credible), to decide what deductions he has adequately substantiated.

## II.  Schedule C Deductions

Pace deducted a wide range of business and nonbusiness expenses on his Schedule C.  We divide them into categories and look at each in turn.

### A.  Section 274 Expenses

Certain deductions have enhanced substantiation requirements under sections 274 and 280F.  These categories include travel, meals and entertainment, and certain forms of "listed property." The term "listed property" in section 274 includes any passenger automobile.  Sec. 280F(d)(4)(A).  To deduct any expenses related to such property, a taxpayer must "[substantiate] by adequate records or by sufficient evidence" the amount, time and place, and business purpose of the expenditure.  Sec. 274(d).

#### 1.  Car Expenses[5]

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $8,639 | $1,725 | ($6,914) | $8,270 | $4,992 | $1,725 |

---

[5] One of the more bedeviling aspects of this case was the parties' constant bombardment of the Court with concessions, partial stipulations both oral and written, and testimony that seemed to contradict the concessions and stipulations.  (In fairness to the Commissioner, we do note that most of this rhetorical shelling came from Pace's camp.)  The Commissioner's counsel helpfully summarized the various amounts still seemingly at issue in posttrial briefing, and we summarize at the beginning of each section the conflicting numbers from Pace's original return, the revenue agent's report, the notice of deficiency, what Pace claimed before (and sometimes during) trial, what he claimed in his posttrial brief, and what the Commissioner allowed at trial.

Pace offered his appointment book, spreadsheets, and credit-card statements in an attempt to substantiate his car expenses. While Pace showed that he spent freely on his Jaguar, he failed to demonstrate his business use of the vehicle. His appointment book does not record the number of miles driven and rarely, if ever, describes the business purpose for a particular entry. Many entries--illegible or containing a single word--fail to describe the purpose of the expense. The credit-card statements prove that Pace spent money on gasoline and car washes, but there is nothing to indicate that these expenses had a business purpose. The car-insurance expense was not allocated between Pace's Jaguar and his wife's personal-use Honda. He depreciated his car using a novel method,[6] but the Code does not allow such creativity.

The Commissioner could have disallowed the car expenses in their entirety--the strict substantiation requirements of section 274(d) do not allow this Court to approximate expenses. Sanford v. Commissioner, 50 T.C. 823, 827-28 (1968), affd. 412 F.2d 201 (2d Cir. 1969); see also sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). But in a spasm of bureaucratic generosity, the Commissioner allowed $1,725 in

---

[6] Pace multiplied the cost of the car by the number of months he owned the car in 2001 over its useful life, multiplied by the percentage of business use of the car. He didn't calculate the "correct" amount of depreciation even using his own method.

expenses based on mileage.  This mileage allowance encompasses all of the "actual" car expenses claimed, including insurance, gasoline, depreciation, etc., and we limit Pace's allowable car-expense deduction to this amount.

### 2.    Meals and Entertainment

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $9,227 | 0 | ($9,227) | $17,057 | $18,854 | 0 |

Pace often dined at fine restaurants and his country club in 2001.  But he did not meet section 274's substantiation requirements for meals and entertainment expenses.  He also failed even to identify in his posttrial brief which expenses comprise the amount listed for meals and entertainment expenses.  And he showed no business purpose.  As with car expenses, section 274 does not allow us to approximate.  Sanford, 50 T.C. at 827-28.  And, unlike with the car expenses, the Commissioner didn't give anything away.  We agree with the Commissioner.

### 3.    Travel

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $6,418 | 0 | ($6,418) | $8,959 | $5,494 | 0 |

Pace traveled extensively in 2001, spending thousands of dollars on airfare, hotels, and incidentals.  But he has failed to adequately substantiate such expenses under section 274.  He provided credit-card statements and his appointment book as

evidence, but the appointment book didn't include the purpose of the travel.  A substantial portion of the travel expenses also appears to be related to nonbusiness travel--including a pilgrimage to Lourdes that he undertook as a Knight of Malta and wine-tasting events in Paris.  We therefore uphold the Commissioner's denial of all travel expenses.

B.    Employee-Benefit Expenses

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R allowed at trial |
|---|---|---|---|---|---|
| $46,723 | $1,347 | ($45,376) | $29,174 | $29,174 | $29,174 |

Pace conceded the disallowance of $45,376 in employee-benefit expenses, but argued at trial that $27,827 in federal and state employment-tax expenses--which the revenue agent allowed in his report--should be recategorized as employee-benefit expenses. Because it does not affect the amount of the deficiency, the Commissioner went along with the recategorization.  The $29,174 employee-benefit deduction allowed by the Commissioner at trial consists of the $1,347 in employee benefits allowed at audit, plus the $27,827 transferred from employment taxes.  Pace conceded this calculation in his reply brief.

C.    Office Expenses

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $2,763 | $2,763 | 0 | $9,687 | $7,815 | $2,763 |

The Commissioner allowed Pace's $2,763 office-expense deduction in full. But Pace wants more, claiming at trial that he should be entitled to $9,687 in office expenses. On brief, however, he claims only $7,815.[7] We therefore conclude that Pace abandoned his $9,687 office expense argument. See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988); Cerone v. Commissioner, 87 T.C. 1, 2 n.1 (1986); Rockwell Intl. Corp. v. Commissioner, 77 T.C. 780, 837 (1981), affd. 694 F.2d 60 (3d Cir. 1982). Even if he had not abandoned his arguments for a $9,687 deduction, we would reject it on the record before us.

Pace attempts to substantiate $1,711 in office expenses with a list of expenses containing check numbers, dates, and descriptions. He did not, however, introduce into evidence the underlying canceled checks, and the only testimony supporting the deduction was conclusory statements by Pace and his secretary that the office expenses were "incurred in the ordinary course of business." Therefore, we disallow in full these office expenses.

Evaluating the remaining $6,698 in contested office expenses led to some engaging reading--nearly 150 pages of credit-card statements. Pace provided annotated statements to back up these

---

[7] In his brief, Pace broke down his office expenses by payment method: credit card, $6,698; check, $1,117. The $1,117 varies from the $1,711 claimed at trial because of a transposition error in the brief.

deductions.[8]  But the majority of these expenses aren't business

related.  Here are the "office expenses" lacking a valid business

purpose:

| Expense | Amount |
|---------|--------|
| Prescription drugs | $4,769 |
| Clothing | 896 |
| Annual credit-card fees | 600 |
| Religious books | 508 |
| BCH Catholic U | 40 |
| TOTAL | 6,813 |

### 1.  Prescription Drugs

Pace explained why he deducted his prescription drugs as an

office expense--"if Dean Francis Pace is not healthy to conduct a

practice, [the firm] doesn't exist."  But personal expenses

aren't deductible as business expenses.  Trebilcock v.

Commissioner, 64 T.C. 852 (1975), affd. 557 F.2d 1226 (6th Cir.

1977).  Section 1.262-1, Income Tax Regs., states that "no

deduction shall be allowed, except as otherwise expressly

provided * * *, for personal, living, and family expenses."  The

regulation goes on to list examples of personal expenses.

Medical expenses--under which prescription drugs clearly fall--

are included as a personal expense, with a cross-reference to the

_____

[8] Pace's substantiation for the $6,698 in office expenses
actually shows a total of $7,643.  The source of this disparity
is unclear from the record.

express provision of their deductibility under section 213 (medical expenses) alone. Sec. 1.262-1(c)(6), Income Tax Regs. Therefore, Pace can't deduct his prescription drugs as a section 162 business expense.

### 2. Clothing

Pace deducted custom-made shirts and a tie as office expenses. He explained that he found it difficult to buy some of his clothes off the rack because of his unusual physique. Our own observation makes us suspect that Pace was being modest, but no inspection could affect our necessary conclusion: expenses in this category are not deductible because Pace failed to establish that the clothing was not suitable for everyday wear. See, e.g., Hamilton v. Commissioner, T.C. Memo. 1979-186; Rev. Rul. 70-474, 1970-2 C.B. 35. And he wore one of his bespoke shirts to trial-- showing without any doubt its suitability for everyday use.

### 3. Annual Credit-Card Fees

Pace maintained ten credit cards during 2001. None of the cards were issued in the name of the law firm, and Pace used all the cards for both personal and business expenses. The percentage of business use as compared to personal use is unclear. He can't deduct the annual fees because he failed to establish the business use of the credit cards.

### 4. Religious Books

As a Knight in Obedience, Pace is required to read certain books chosen by the Order. He improperly deducted the cost of these books as a business expense--such spiritual reading is personal.

### 5. BCH Catholic U

Pace included a $40 payment to "BCH Catholic U" as an office expense. We're not sure what BCH Catholic U is--it shows up on one of his credit-card statements and Pace didn't explain it. Thus, Pace didn't establish the deductibility of this payment.

### 6. Other Deductions

Unlike the bulk of the office expense deductions, the following deductions seem to have a valid business purpose:

| Vendor | Amount |
|---|---|
| Sports Illustrated | $30 |
| Daily Journal | 75 |
| Best Buy | 86 |
| Circuit City | 497 |
| Amex appointment book | 56 |
| Total | 744 |

Pace credibly testified that Sports Illustrated and the Daily Journal--a legal newspaper--were used in his office. He also testified that the Best Buy and Circuit City expenses were for office computer equipment. And the Amex appointment book seems reasonable as well. But he failed to establish that these

expenses were not already included in the $2,763 he deducted on his 2001 return.  He didn't produce the documents used to prepare his 2001 return, so there is no way to verify what items were previously allowed.  We therefore disallow these deductions.

D.   Charitable Contributions

The key issue regarding Pace's charitable contributions is whether they should be transferred from Schedule C (where he claimed them) to Schedule A.[9]  An individual's Schedule C deductions--unlike Schedule A deductions--have the advantage of being neither limited to a percentage of a taxpayer's contribution base nor phased out at a high income.  During the return-to-audit-to-trial-to-briefing voyage, Pace's claims of the amount and characterization of his charitable contributions bobbed up and down.  We divide them into two categories: contributions that are related to the Order and those that are not.

1.   Non-Order Contributions

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $133,196 Sch. C | 0 Sch. C $132,154 Sch. A | -$133,196 Sch. C +$131,754 Sch. A | $67,700 Sch. C | $67,700 Sch. A | $69,650 Sch. A |

---

[9] Pace originally included all but $400 of the claimed charitable contributions on Schedule C.

On his Schedule C, Pace deducted $133,196 as "charitable contributions." The Commissioner disallowed the entire amount on audit, but found that $69,650 of the contributions were legit and moved them to Schedule A as charitable contributions. In preparation for trial, Pace created a detailed schedule showing $67,700 in non-Order contributions, but kept insisting that they should be included as a business expense. Then, in postrial briefing, Pace conceded that these non-Order contributions should also be moved to Schedule A.

We find Pace's documentation and testimony regarding the $67,700 in non-Order charitable deductions credible, albeit properly reported only on his Schedule A. But Pace claimed $1,950 less than the IRS allowed, and we treat that reduction as a concession.

### 2. Order-Related Contributions

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $12,369 Sch. C | 0 | ($12,369) Sch. C | $64,359 Sch. C | $64,359 Sch. C | $62,504 Sch. A |

Pace started out with a $12,369 Schedule C deduction for "bar and business development." The vast majority of expenses in this category, however, turned out to be contributions to the Knights or related activities. During audit, Pace provided additional documentation of these contributions, and the Commissioner eventually allowed $62,504 on Schedule A. Pace

changed his mind again preparing for trial, claiming $64,359 in Order-related contributions, but continued to defend against the Commissioner's siege on his Order-contributions-should-remain-on-Schedule-C argument.

We find Pace's evidence--both records and testimony--of the amounts of these contributions credible, and his grand tour through the Order's medieval and early modern history engaging. But his argument for treating them as business expenses, rather than charitable contributions, is another matter. Payments that qualify as charitable contributions are not deductible as ordinary and necessary business expenses under section 162 if they fail to qualify as legitimate business expenses. Hartless Linen Serv. Co. v. Commissioner, 32 T.C. 1026, 1030-31 (1959); Gage v. Commissioner, T.C. Memo. 2002-72; sec. 1.162-15(a), Income Tax Regs. Charitable contributions must be made for detached and disinterested motives. Commissioner v. Duberstein, 363 U.S. 278, 285 (1960); Sklar v. Commissioner, 549 F.3d 1252, 1259 (9th Cir. 2008), affg. 125 T.C. 281 (2005). A payment is generally not deductible when a taxpayer receives a benefit in exchange. Sklar, 549 F.3d at 1259.

Pace explained why he contributes to the Knights: "we even take an oath that we will devote our time, talent, and treasure to [the Order], and that's a religious order promise or oath." As honorable as Pace's intentions are, the time, talent, and

treasure he devoted to the Knights were given with a religious, rather than business, purpose in mind.  Since these expenses qualify as charitable-contribution deductions, they are not deductible as ordinary and necessary business expenses.

Pace doesn't get the tax benefit of moving his contributions to Schedule C, but does get to deduct $132,059 in total charitable contributions--Order and non-Order donations--on his Schedule A ($95 less than the amount the IRS allowed on audit).

E.    Litigation Expenses

Pace's law practice focuses on contingency-fee litigation, but also takes some cases on a noncontingency basis.  He claims deductions for litigation expenses[10] from both types of cases.

1.    Contingency-Fee Litigation Expenses

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $131,986 | 0 | ($131,986) | $146,077 | $146,077 | $2,028 |

Pace wants to deduct $146,077 in litigation expenses for 2001.  But he paid most of the expenses from 1997-2000, which usually would mean--since he is a cash-basis taxpayer--that he

---

[10] Litigation expenses are out-of-pocket expenses that are necessary to bring a case to its conclusion.  Attorney's fees-- what a lawyer is paid for his time--are distinct from litigation expenses.  Common litigation expenses include copying costs, expert witness consultations, costs of hiring investigators, deposition costs, long-distance phone charges, travel to depositions out of state, and shipping fees.  Advancing litigation expenses in *qui tam* and other contingency-fee litigation is common.  See 1 Attorneys' Fees, sec. 2:13 (3d ed. 2010).

can't win on this point.  But there's an exception in some cases to the deduct-in-the-year-paid rule for contingency-fee-litigation expenses.  And at least some of Pace's litigation expenses were incurred in contingency cases--a *qui tam* case against Fluor Corporation that settled in 2001 and three Fluor Corporation retaliation cases that settled in 2000.[11]  We consider the following:

- Are the Fluor litigation expenses deductible in the year of settlement?

- What expenses did Pace actually pay?

- How should the expenses be allocated between the *qui tam* and retaliation cases?

    a.    Deductibility of Litigation Expenses in the
          Year of Settlement

Pace relies primarily on Canelo v. Commissioner, 53 T.C. 217 (1969), affd. 447 F.2d 484 (9th Cir. 1971), as authority for his deducting contingency-litigation expenses in the year of settlement.  See also Boccardo v. Commissioner, 56 F.3d 1016 (9th Cir. 1995), revg. T.C. Memo. 1993-224; Hearn v. Commissioner, 309 F.2d 431 (9th Cir. 1962) (holding that taxpayer could not take uncollected litigation expenses in year at issue), affg. 36 T.C. 672 (1961); Burnett v. Commissioner, 42 T.C. 9 (1964), affd. in

---

[11] Pace's records collectively refer to these four cases as the Hoefer case.  Patrick Hoefer was the relator--the individual suing on behalf of the government--in the Fluor Corporation *qui tam* litigation, and Hoefer also brought the retaliation cases against Fluor Corporation.

part and remanded on other issue, 356 F.2d 755 (5th Cir. 1966).
But it isn't quite that simple. In Canelo, the taxpayers were
personal-injury attorneys who customarily advanced litigation
expenses to clients under contingency-fee contracts, recovering
the expenses from clients only upon successful resolution of a
case. Id. at 218. They deducted the advanced expenses in the
years they were paid as section 162 business expenses, and
reported them as income if they were reimbursed when a case paid
off. Id. at 219. We held that the advances were analogous to a
loan, because the lawyers made them with the reasonable
expectation of reimbursement. Id. at 224. This prompted us to
hold that the advances were not deductible as business expenses
in the year paid--the lawyers had to wait until resolution of the
case because the "unconditional obligation to pay a fixed sum
does not arise until the case is closed" in contingency
litigation. Id. at 225-26. If a contingency case closed without
any recovery, then the advanced expenses would be deductible in
that year as a bad-debt deduction. Id. at 226. And if there was
a successful recovery, the resulting offset of the advanced
expenses would not be income, but would be treated as repayment
of the loan principal. Id.

Pace deducted the litigation expenses at issue here on his
2001 return--the year of settlement for the substantive *qui tam*
case. This is certainly wrong--even if Pace is right in his

argument that <u>Canelo</u> controls, he should have excluded the reimbursed advanced expenses from income, rather than deducted them.  But we can easily recharacterize the deduction as an exclusion because both yield the same tax result.  The deeper problem is that Pace may have been reimbursed differently from the taxpayers in <u>Canelo</u>.  In <u>Canelo</u>, we characterized the expenses advanced as a loan to the client for costs that he would otherwise have had to pay himself.  The False Claims Act, in contrast, requires a losing *qui tam* defendant to pay his adversary's litigation expenses.  See 31 U.S.C. sec. 3730(h) (2006).  But we think this amounts to little more than saying that the potential recovery in a false-claim case might include a different category of damages from a personal-injury case.

The real distinction in the caselaw isn't between different types of cases, but between different terms in the lawyers' contracts with their clients.  In <u>Canelo</u>, the contract provided for the lawyer to collect a percentage of the recovery won by the client net of expenses.  If the client collected on a judgment or settled, the advanced costs were to be repaid out of the proceeds. That created a conditional obligation of the client to pay for the expenses.  In contrast, when a personal-injury lawyer's contract provides for him to collect a percentage of the gross recovery but he has to pay the expenses himself, he gets to deduct those expenses as he incurs them, see, e.g., <u>Boccardo v.</u>

Commissioner, 56 F.3d at 1019, but has to include the full amount of the fee in the year he receives it.

Pace's situation is much more like Canelo's. His contract with Hoefer stated that

> Pace will advance expenses and costs, which will be deducted from any gross recovery before calculation of the fifty percent (50%) contingent fee. In the event there is no recovery, Client will have no obligation to Pace for any expenses or costs expended by Pace.

Whatever the default rule on who bears expenses in false-claims cases might be, this contract makes them just like the expenses of the personal-injury litigation analyzed in Canelo. And so we'll treat them the same--Pace can treat them as an exclusion from his income in the year of settlement.

To exclude the entire reimbursement from income, however, Pace must prove that he actually advanced the expenses and that he actually incurred them in prosecuting the case that settled in 2001. If the expenses are allocated to cases that settled in other years--such as the retaliation claims--he can't exclude them from his 2001 income. The exclusion for such fees would benefit him in a tax year not at issue.

b.   Amount of Expenses

The parties disagree about the total expenses that Pace actually advanced. Pace argued for $146,077 at trial, but the Commissioner found support for only $127,842.

Why the $18,235 difference?  The Commissioner is of the opinion that Pace is double-dipping--counting many of his expenses twice.  He claims that Pace provided duplicates of several cancelled checks to substantiate the advanced expenses.  After examining the evidence, we find that both the Commissioner and Pace were partly right.  Some of the checks were included more than once, but Pace didn't ever refer to the same check more than once for his claimed expenses.  Instead, Pace claimed some expenses without any substantiation.  Here's what he failed to substantiate:

| Date | Description | Amount |
| --- | --- | --- |
| 6/5/98 | Complaint Hoefer Hanford action | $256.20 |
| 12/28/98 | Racklin depo Arlin R. Tueller & order | 117.50 |
| 7/30/99 | Janney & Janney certified copy | 45.00 |
| 11/9/99 | Racklin depo of Sarah M. Bruck on 2/1/99 | 740.50 |
| 9/15/99 | Janney Filing OCSC state complaint | 112.50 |
| 9/16/99 | Service summons & complaint on Fluor Daniel Inc. | 78.00 |
| 11/10/99 | Notice of appeal Hoefer | 105.00 |
| 11/12/99 | Sally Marshall CSR Hoefer transcript of hearing on 11/8/99 | 75.00 |
| 8/11/00 | Sanctions by USDC | 16,031.86 |
| 11/14/01 | Trial Rider Investigations Ltd., former DCIS Special Agent Armstrong | 1,995.00 |
| 9/29/01 | Catholic University School of Law Board of Visitors | 1,000.00 |

| 8/28/01 | Ryan Brown | 500.00 |
|---|---|---|
| 6/8/98 | Messenger service USDC | 35.75 |
| 6/8/98 | Messenger service MTO | 19.80 |
| 6/17/98 | Messenger service MTO | 19.80 |
| 12/15/98 | Messenger service to Janney for service of process | 13.20 |
| 1/25/00 | ADS final bill re Hoefer | 32.13 |
| 6/22/00 | Messenger service USDC | 41.60 |
| 7/14/00 | Messenger service Munger Tolls | 1.75 |
| 1/4/01 | Messenger service Ausa Plessman | 22.00 |
| 9/27/00 | FedEx Bart Williams at Munger on 6/28/08 | 16.06 |
| 9/27/00 | FedEx Knox Atty Svs | 39.26 |
| 9/27/00 | FedEx Louis Goldsman CPA | 10.61 |
| 11/1/00 | USDC SA | 10.61 |
| 4/1/99 | Summitt Reproduction | 32.73 |
| 10/23/00 | Summitt Reproduction | 55.01 |
| No date provided | In-house reproduction of Hoefer *Qui Tam* | 3,580.26 |
| No date provided | Facsimiles Hoefer *Qui Tam* | 1,243.00 |
| TOTAL | | 26,230.13 |

Therefore, Pace has established that he incurred $119,847 ($146,077 - $26,230) in litigation expenses for the Hoefer *qui tam* and retaliation cases.

### c.  Allocation of Expenses

Our next step is to figure out how to allocate the $119,847 in litigation expenses between the *qui tam* and the retaliation

cases.  Pace would prefer to allocate the entire amount to the *qui tam* case, because "if there is no violation of the False Claims Act, then there cannot be any retaliation."  He essentially argues that the retaliation and *qui tam* claims are a single cause of action, because the two cannot be meaningfully separated and are dependent on each other.  We decide whether the retaliation claim is a separate cause of action by considering:

- The language of the False Claims Act,

- interpretative caselaw, and

- Pace's settlement and retainer agreements.

Then we'll address the proper allocation of expenses.

### i.   Language of the False Claims Act

The False Claims Act, 31 U.S.C. secs. 3729-3733 (2006), authorizes both substantive *qui tam* and retaliation claims.  This seems to suggest that retaliation and *qui tam* claims are part of the same cause of action.  But a closer look at the statute suggests otherwise.  Authority for *qui tam* actions is outlined in 31 U.S.C. section 3730(b)(1), while the requirements to bring a retaliation claim are laid out in 31 U.S.C. section 3730(h):

> Any employee who is discharged, demoted, suspended,
> threatened, harassed, or in any other manner
> discriminated against * * * because of lawful acts
> * * * in furtherance of an action under this section,
> including investigation for, initiation of, testimony
> for, or assistance in an action filed or to be filed
> under this section, shall be entitled to [relief].
> * * *

31 U.S.C. sec. 3730(h) (2006).  On its face, the statute does not require violation of the False Claims Act for a valid retaliation

claim.  The employee need only take steps "in furtherance of an action."  The plain language suggests that a retaliation claim may be pursued even before an underlying *qui tam* claim is filed—"an action filed *or to be filed*."  (Emphasis added.)  If one can pursue a retaliation claim for investigating a possible violation of the False Claims act that hasn't even been filed yet, surely it isn't necessary to prove a *qui tam* action to prove, or even commence, a retaliation claim.

Paragraph (h) also states that "an employee may bring an action" in retaliation cases, while paragraph (b)(1) requires that "the action shall be brought in the name of the Government" for *qui tam* claims.  Paragraph (b)(2) also requires that complaints for such claims be served on the Government.  The fact that the Government is not named as a plaintiff in the retaliation case suggests that it is a separate cause of action from the brought-on-behalf-of-the-Government *qui tam* case.

## ii.  Interpretive Caselaw

A leading treatise on the False Claims Act cites a substantial body of caselaw[12] for the proposition that, to

---

[12] See Wilkins v. St. Louis Hous. Auth., 314 F.3d 927, 931-32 (8th Cir. 2002) (distinguishing requirements of retaliation claims from those of *qui tam* claims); Abner v. Jewish Hosp. Health Care Servs., Inc., 2008 WL 3853361, at *8 (S.D. Ind. Aug. 13, 2008) (entry on defendant's motions for judgment on the pleadings) (noting that 31 U.S.C. section 3730(h) does not require plaintiff to prove fraud on the merits); U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28
(continued...)

prevail in a retaliation claim, "a plaintiff is not required to show that the defendant actually committed a False Claims Act violation."[13]  Sylvia, The False Claims Act: Fraud Against the Government, pt. II, sec. 5.15 (West 2010).  This, too, supports treating retaliation and *qui tam* claims separately.

### iii. Retainer and Settlement Agreements

Pace entered into a single retainer agreement with his client for the Fluor litigation that included both the retaliation and *qui tam* claims.  It provided that Pace will represent the client for "*Qui Tam* action(s) against Fluor Corporation * * * pursuant to the False Claims Act * * * and related constructive termination action(s)."  At least in terms of internal recordkeeping at his firm, Pace doesn't seem to have distinguished the two types of claims.  On the other hand, Pace

---

[12](...continued)
(D.D.C. 2003) (allowing a retaliation claim to proceed even though initial False Claims Act allegations were not viable); Elliott v. Lake Cnty. Cmty. Action Project, 2000 WL 949476 (N.D. Ill. July 6, 2000) (observing that few would report fraud if they could be fired if their suspicions failed to pan out); United States ex rel. Yesudian v. Howard Univ. 153 F.3d 731, 739-40 (D.C. Cir. 1998) ("the protected conduct element * * * does not require the plaintiff to have developed a winning *qui tam* action before he is retaliated against"); Luckey v. Baxter Healthcare Corp., 2 F. Supp. 2d 1034, 1050 (N.D. Ill. 1998) (stating that a 31 U.S.C. sec. 3730(h) claim may "proceed even if neither governmental action is taken nor any *qui tam* action is contemplated, threatened, filed, or ultimately successful" (fn. ref. omitted)), affd. 183 F.3d 730 (7th Cir. 1999).

[13] Thus even if an employee reports an action that does not violate the False Claims Act, the employee may still seek protection from resulting retaliatory acts.

did in fact settle the retaliation claims separately from the *qui tam* claim--the retaliation claims in August 2000, and the *qui tam* claim in May 2001. It's hard to see how the retaliation could be dependent upon the *qui tam* claim when it settled nine months before. Despite the fact that the retainer agreement groups the retaliation and *qui tam* claims together, their separate settlement strongly suggests that they are separate causes of action.

### iv. Allocation of Expenses

The plain language of the False Claims Act, interpretive caselaw, and terms of the settlement agreements convince us that the retaliation claims are separate from the *qui tam* claim. This means that we have to allocate the expenses between them, because the retaliation case was settled in 2000 and expenses allocated to that case cannot be excluded from Pace's 2001 income.

Pace points to the retaliation claims' settlement agreement as an allocation-of-expenses guide. The agreement provides for a $440,000 settlement of the three retaliation claims and expenses of $60,869. After deducting expenses, Hoefer would get half of the remaining $379,131. The other half of the net recovery would be split between Pace and Phillip Benson, another attorney who worked on the matter. That Benson was involved in the retaliation case, but not the *qui tam* case, makes using the settlement agreement as a guide to allocate expenses more

reasonable, because Benson would have an incentive to allocate to the retaliation case as much of the recovery and as few of the expenses as possible--since that is where he would get his share--while Pace's incentive would be to allocate as few of the expenses as possible to the *qui tam* case.

The Commissioner urges us instead to look at the carbon-copy portion of Pace's cancelled checks. Most of these note the docket numbers of the retaliation cases, instead of the *qui tam* docket number. By matching up the checks with their respective carbon-copy-docket numbers, the Commissioner concludes that $122,592 in expenses should be allocated to the retaliation cases. Pace counters that the retaliation docket numbers were an internal accounting quirk. He claims to have used the retaliation docket numbers because the *qui tam* case had not settled yet and there weren't any proceeds to tie to the expenses. We find the retaliation-settlement agreement to be a more reliable guide to allocating expenses than Pace's haphazard internal accounting.

We therefore find that $60,869 in expenses is allocable to the retaliation cases while the remaining $58,978 of the substantiated expenses goes to the *qui tam* case. Of the $150,000[14] Pace indirectly received for expenses, $58,978 is

---

[14] As part of the 2001 settlement, Fluor agreed to reimburse $300,000 of Hoefer's attorney's fees. Pace then waived the

(continued...)

offset from income as reimbursed expenses.  The remaining $91,022 is taxable.

### 2.  Noncontingency Fee Litigation Expenses

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| 0 | 0 | 0 | $115,190 | $25,443 | 0 |

Pace concedes $89,190 of noncontingency litigation expenses on brief.  But there appears to be a math error--his brief contains an itemized list of each conceded expense that actually adds up to $95,042 in concessions.[15]  Therefore, it seems that all but $20,148 in noncontingency expenses has been conceded ($115,190 - $95,042).  But it isn't entirely clear how some of the conceded expenses correspond to the original list of $115,190 in expenses--most match up, but some do not.  Below are the expenses that were not clearly conceded:

| Date | Description | Amount |
|---|---|---|
| 2/13/01 | Chaine Baillage Du Golden West dues | $475.00 |
| 2/27/01 | Stephanie Reavesdail reimbursement IPPO/SG | 12.95 |
| 3/5/01 | Louise Sanford CSR transcript IPPO/SG | 11.80 |

---

[14](...continued)
original term for expense recovery--100 percent to Pace--and instead received 50 percent, or $150,000.

[15] Another math error occurred when Pace claimed $25,443 on brief--$89,190 subtracted from $115,190 equals $26,000, not $25,443.  This difference does not affect our analysis.

| 5/16/01 | ABTL annual dues to Assoc. of Business Trial Lawyers | 75.00 |
|---|---|---|
| 7/12/01 | Moller International | 10,000.00 |
| 7/13/01 | Experian--Credit Reports | 21.00 |
| 7/17/01 | Bernhard Kreten, Esq. | 10,000.00 |
| 8/2/01 | Secretary of state counter fee | 15.00 |
| 9/10/01 | Trans Union credit report | 8.50 |
| 11/9/01 | L.A. County Bar Assoc. | 170.00 |
| 12/10/01 | Merrill Corp. re Shroff, QT3 | 110.99 |
| TOTAL | | 20,900.24 |

We'll give Pace the benefit of the doubt and find that $20,900.24 is being claimed, instead of the $20,148 in his brief.

But claiming an expense is quite different from proving it. Pace didn't provide any backup documentation for these expenses beyond a self-prepared log. Without any cancelled checks, bank statements, or other substantiating evidence there is no way to verify whether Pace actually paid these expenses. And it isn't clear whether all the expenses are business-related. For example, he claims $475 in dues for Chaine Baillage Du Golden West--a food-and-wine society. There is insufficient information in the record to verify that this was a legitimate business expense. And then there's $10,000 to Moller International. The record contains no information about Moller International or how it could be an expense of litigation. In sum, we deny the entire deduction for failure to substantiate.

III. Schedule A Deductions

Pace does not live by Schedule C deductions alone, so we next turn to Schedule A.

A.   Bad Debt

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| N/A | N/A | N/A | $50,000 | $50,000 | 0 |

Pace didn't claim a bad-debt deduction on his return. At trial he changed his mind and claimed a $50,000 loss for unpaid attorney's fees. As evidence of the bad debt, he provided a $50,000 check from a former client that had never cleared (the former client had fired Pace and stopped payment on the check). But Pace never reported the $50,000 check as income. He can't claim a loss for unpaid fees if they were never included in gross income. See sec. 1.166-1(e), Income Tax Regs. The litigation expenses and fees Pace incurred for the former client were also reimbursed by the replacement counsel, which means he didn't have any bad debt to deduct.

B.   State and Local Taxes

| Claimed on return | RA's report | NOD adjust. | P claimed at trial | P claimed in brief | R argued at trial |
|---|---|---|---|---|---|
| $34,989 | 0 | ($34,989) | $34,989 | $34,989 | 0 |

Section 164(a)(3) provides for the deduction of state and local income taxes paid during the taxable year. Pace is a cash-

basis taxpayer.[16]  Therefore, he may deduct only state and local income taxes actually paid in 2001.  He has failed to establish that the California state taxes he deducted on his 2001 return were paid in 2001.  His 2001 California return shows a $34,989 tax liability--precisely the amount of state and local taxes deducted on his 2001 federal return.  But Pace couldn't possibly have paid his 2001 California state taxes during 2001, because the California return wasn't executed until 2003 (and he showed us no evidence of withholding, estimated payments, or designated use of the prior year's refund to the California Franchise Tax Board).  He hasn't offered any other evidence to establish that state and local taxes were paid in 2001.  We therefore uphold the disallowance of this deduction in full.

IV.  Penalty and Addition to Tax

A.   Section 6651(a)(1) Failure to File

The Code imposes an addition to tax if a taxpayer fails to file on time, unless he can show that his failure was due to reasonable cause and not willful neglect.  Sec. 6651(a)(1).  Pace concedes he filed late and offers no evidence that the failure to file was due to reasonable cause and not willful neglect.  We therefore find that the failure-to-file addition applies.

---

[16] There was a minor dispute between the parties over Pace's method of accounting and whether he made an unauthorized change of method.  We find that he was and still is a cash-basis taxpayer.

B.    Section 6662 Accuracy-Related Penalty

Section 6662 imposes an "accuracy-related penalty" of 20 percent of the portion of the underpayment of tax attributable to any substantial understatement of income tax.  By definition, an understatement of income tax is substantial if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return."  Sec. 6662(d)(1)(A).  Pace's return reported a total tax due of $152,755; the notice of deficiency determined a liability of $305,730.

We agreed with the Commissioner on most--but not all--of the disallowed deductions,[17] so the "tax required to be shown on the return" is somewhat less than $305,730.  Since we won't know the precise amount of tax required to be shown on the return until completion of Rule 155 computations, we'll give Pace the benefit of the doubt and set the required-understatement-threshold amount at $30,573.[18]  Even without plugging the changes into the black

---

[17] The notice of deficiency included a $361,000 adjustment to income.  After concessions and trial, there's still a $302,022 adjustment--Pace proved only that he's entitled to an extra $58,978 deduction for contingency-litigation expenses while the remainder of the Commissioner's determination was substantially correct.

[18] This is equal to 10 percent of the notice of deficiency's determination of tax due.  In reality, the penalty-triggering amount for the understatement is lower, because we allowed some deductions that the Commissioner did not--resulting in a lower tax due.  (Though the movement of some deductions from Pace's Schedule C to Schedule A figures to lead to a bit of an increase in tax due.)  The actual 10-percent-penalty trigger would

(continued...)

box of Rule 155 computations, it's clear there was an understatement in excess of ten percent of the tax required to be shown--we are upholding 84 percent of the Commissioner's adjustments to Pace's income. We therefore find that there was a substantial understatement.[19]

Pace offers a novel defense to the accuracy-related penalty in his opening brief--that it's the IRS's fault because it didn't settle. Review of the caselaw fails to find any support for this penalties-don't-apply-when-the-IRS-won't-settle argument. And Pace never argued any of the valid defenses to the penalty. See secs. 6662(d)(2)(B), 6664(c)(1). We therefore find that he is subject to this penalty.

C.   Section 6673 Delay Penalty

The Commissioner has moved to impose a penalty under section 6673(a)(1), which authorizes us to impose a penalty not in excess of $25,000 whenever it appears that proceedings have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless. Pace vigorously contested the Commissioner's determination, resulting in a weeklong trial, 760 pages of trial

---

[18](...continued)
therefore be less than $30,573.

[19] The Commissioner also argued that Pace is subject to the section 6662 penalty based on negligence. Our finding of a substantial understatement means that we don't need to address this argument.

transcript, and thousands of pages of credit-card statements, canceled checks, and other documents.  But Pace's aggressive advocacy doesn't rise to the level of sanctionable behavior.  He may be long winded--as many lawyers and even some judges are--but delay and frivolous positions were not the crux of his case.[20]

In the best of all possible worlds, perhaps, Pace's pursuit of the unified life would be recognized and rewarded.  See, e.g., Pope Paul VI, Pastoral Constitution on the Church in the Modern World--Gaudium et Spes sec. 43 (December 7, 1965).  But the Code imposes a more exact and less merciful accounting:  business expenses, charitable contributions, and the costs of everyday life must be identified, segregated, and substantiated by reliable documents and credible testimony.

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[20] Pace nevertheless remains on the list of those previously cautioned against frivolity.  See <u>Pace v. Commissioner</u>, T.C. Memo. 2000-300.